Please be seated. Would the clerk call the next case, please? 321-552-0505, 321-552-0520. The drink is Pina v. GKN. Pina v. GKN. Pina v. GKN. v. GKN. Over and out of zero. Pina v. GKN. Pina v. GKN. Pina v. GKN. Thank you. Mr. Black, good afternoon. Good afternoon. May it please the Court, Counsel, my name is Robert Black, and I'm here on behalf of all the plaintiffs in this consolidated matter. What we have in front of us here today is a tasty summary judgment. It is a summary judgment that was entered by erroneous application of the factors and standards for summary judgment. Now, a couple of the primary ones are there should be no weighing of evidence or credibility determinations at summary judgment. It's ultimately for the prior effect. All inferences are supposed to be in favor of the non-user. And where there are disputed facts or there are inferences to be drawn from undisputed facts, then summary judgment is not appropriate. So beginning with that, I'm going to go through some of the basic facts here. And the basic facts is we had a catastrophic accident involved here. Defendant Edgar was driving and he failed to see a stop sign, he testified, at 195th Road and Route 34. There was no stop sign for the traffic on Route 34. There was an unfortunate collision there because he did not stop at a given catastrophic injuries as a result. Now, GKN had hired Overhead Iron Horse to do annual inspections that were mandated by OSHA. And I say Overhead Iron Horse because there's an issue of facts still before the carcoal lynching, whether that is a joint venture. And there are facts in here that suggest a joint venture. Is that relevant to the question? Not overly so. I mean, it just removes one more level of separation, degree of separation, that GKN is not. So it wouldn't relate to whether GKN should or should not stand suit? No. I don't believe so, Your Honor. So can I just say one thing? Certainly. Were Iron Horse and Overhead, did they have some kind of arrangement at the time that the contract was entered into? Yes. They shared the same office space, the same location. The owner of Iron Horse, Timothy Day, was also vice president of sales for Overhead. Dave Hager, who owned Overhead, issued checks for the service vehicle and the like. There was a definite interplay there. Iron Horse testimony showed that their sole source of income was from Overhead. And was that known to GKN? Certainly aspects of that were known to GKN. What we have in the record, too, is that GKN claimed that it didn't have knowledge of Iron Horse. But, looking at the record, we have the fact that GKN hired them to do the testing in 2013. And from 2013 to 2016, what they issued to GKN had an acronym and issues of both companies, Overhead and Iron Horse. Beginning then in 2016, Iron Horse was displayed in name on the paperwork. And for 2017, it was the same thing. This accident occurred in 2017. But, at the very minimum, there's a question there as to what GKN knew but did not know. And there's evidence in the record. What is the relevance of that question? It relates to the agency issue. It's not. I was responding to the question. Absolutely. Absolutely right. So, as to the agency issue, we know that the primary cardinal rule for this, as this court determined in Spurl, is the right to control. And it's the right to control that's important. It's not whether it's exercise. It's not whether the other thing is the right to control. The right to control was memorialized, maintained, and communicated by GKN. It was memorialized within the written purchase order where it says time is of the essence and there are penalties for noncompliance. It was indicated and communicated to Overhead Iron Horse representatives. And it was otherwise displayed and communicated to Edgar and to New Jersey, the two workers that were sent over there, by the restrictions that were placed upon them the first two days that they were there. And among those restrictions, they were told where to park, what time to be there, what part of the plant they could go to or move to. And New Jersey testified he was even told what color he was. Now, springing off of that, the issue was raised whether or not Edgar and New Jersey knew about the terms of the purchase, the purchase order terms that got those terms on a small print on the back. Regardless, that does not dissipate the issue of GKN's right to control. But we otherwise do have all of these indications of the right to control being memorialized, maintained, and communicated. Now, the accident itself. We have this thing about the 7 a.m. arrival time. New Jersey said, GKN said, we've got to get there by 7 a.m. Edgar did not have the same testimony, but Edgar did testify that they were to arrive at 7 a.m., and that's at C18938 of the record in his deposition testimony. So somebody told somebody that they had to be there by 7 a.m. Who was? They didn't tell anybody what time to start the trip to get there. No, absolutely not. No, just what time they arrived. And Edgar testified they weren't speeding at the time of the accident. They were not speeding at the time, but the fact that they were not speeding is not mutually exclusive to whether or not he felt that he had to be there by 7 a.m. It's very likely a very sound influence from these facts. They didn't see stop sign because he was worried about the time. It's not just that he was going to speed and he didn't see the stop sign. And if you look at the timing of the accident here, the accident occurred at 635 a.m. in the morning, according to the police accident report. The accident occurred over an hour from the GPS facility. There's no physical way they would have made it there by 7 a.m. The morning before, they from from overhead and from ours called up Edgar and said, Jerzy's truck is out of commission, so we need you to go pick him up. And we'd like you to leave between three, three, three, three, four, five, something like that. Three, three, three, four. This was an hour and twenty five minute trip. I mean, seven miles from Edwards home to Jerzy's home to pick him up. Google Maps said it would take a certain amount of time. I've got an hour, 25 minutes. But I can testify that actually took him two hours and 15 minutes. So there's testimony that they're about. They're leaving the majority of home, which would fit those timeframes. And then 15 minutes later, the accident occurred away from Jerzy's home, directly to GPA. And the location is more than an hour away. And so there was, again, no physical way they could make it there by 7 a.m. Now. We have an issue here about whether Jerzy's testimony is self-serving. I think the prompt and easy response to that is testimony. Case law recited sports. He saw it to a certain extent is always self-serving. It's one of the parties towards her cause of action. But here we have the trial court grabbing on to Edgar's testimony and then saying, because the juristic testimony is contrary to that, that it's not considered. Didn't have a didn't have a sufficient foundation. It's opinionated. It's all these types of things. Jerzy here is uniquely qualified to be giving testimony because he worked with Edgar for the two days. And he was the only passenger in the Edgar vehicle. So to just discount Edgar's or Jerzy's testimony like that is really not what summary judgments are about. Again, it's a fair inference from the facts, either disputed or undisputed, that Edgar didn't see the stop sign because of the trying to get there. An issue was raised or a question was raised by GTN about whether the testimony, deposition testimony of music was compliant with one ninety one eight one ninety one eight. By its express terms applies to affidavits. There's a reason for that. You can't cross examine or ask anybody any questions when they present an affidavit. And normally that rule, I think, is utilized for expert opinions. I'm also unaware of any case in the third district. I know there's cases from other districts, but I'm aware of any case from the third district that extends the deposition situation to what is supposed to be affidavits. We also have here the fact that. Why does this start assuming that there was an agreed upon start? Yes. You can get there. How does that equate to control? We'd like everyone. We'd like these vendors to be in our business, to be admitted at 7 a.m. I think I think this is every case is based upon facts. I think the facts here show that right to control that it's in the field. And part and parcel of it is that they had to be there by 7 a.m. That's not the only part of the control. There's other aspects. But the 7 a.m. start time is significant from the perspective of what was. What was it? I didn't see the stops. Go also to this is this case is that one count based upon the vicarious liability situation is also directly. And much of what we've already been discussing does have some application to the direct evidence. Negances, duty, breach, approximate cause. What is the basis for the foreseeability aspect? Your Honor, the fact that you knew that there would be some travel distance, so that you had a minimum based upon a portal portal, which they were being charged from, which is about 45 miles from a horse overhead facility. The field says they're going to be charged from the park. It's not from the driver's house. They were being charged for that business. And the fact that they were charged for that business, that's that's part and parcel of what they agreed to. But it still reveals that GTN, you or should have known these individuals had to travel a distance. But doesn't every single vendor that comes to my business that I engage, unless they live right there, have to travel? And how does that impose a duty? Well, it's in combination with the start time. Was there any evidence ever that Edgar had been notified or penalized or demoted or given some warnings from prior times that he was late and tardy getting there? I don't recall any specific and certainly not specific to these three days. No, but these individuals, the driver. Right. Honestly, Your Honor, I'm not recalling anything like that from the record. Thank you. So anyway, in terms of the duty, it's you don't have to foresee the precise accident or the extent of the accident. You just have to foresee that it might be caused, might be part of it. Didn't Edgar testify that 7 a.m. was the start time that Iron Horse provided to them for all the clients? He did indeed. And he said that it was a standard operating procedure for Iron Horse. But he also testified that he was told to get there by 7 a.m. And because we have that link between the P.O. and what was communicated down the line, there's still a fact issue. There's still a fact issue as to who told and how that was impressed upon. But no one testified that they were aware of either Edgar or me. The only testimony we have in the record is that it was Iron Horse who provided the 7 a.m. start time from the perspective of Edgar and the driver. Edgar being the driver. Yes. New Jersey, however, testified differently and was discounted because he said that you can communicate it to him. 7 a.m. start time. That's in his deposition testimony. That's in the record. But it was discounted. At summary judgment, that's not supposed to be discounted. There's also, you know, we've talked about other factors like the magnitude of guarding against the consequences. We believe the magnitude is small here and the consequences also small. There's a lot of alternatives here that could have been used. Yes. Besides the start. What are the other arguments you have as it relates to control? Sure. One point. Start time, level of communication, the degree of control, the. The restrictions that were imposed by G.P.M. during a couple of days, including the color of the room to be used, there are a lot of aspects. I've got a question. Sometimes I might have to ask questions. May we give him two more minutes? No, I'd like him to be able to finish what he wanted to say, though. Before I started asking questions. Well, I think you are. I think it's the point where I would say that we also have accounts for loss of consortium, which are the negative constant of some of the work that's negligence and vicarious liability. The same holds true for the loss of consortium. Thank you, Mr. Good afternoon. Thank you for the undisputed fact that John Edgar's negligence occurred while commuting to G.P.M. G.P.M.'s facility to inspect its cranes means that G.P.M. cannot be liable under a vicarious or direct liability theory, whichever is advanced by plaintiffs. Under the facts of this case, G.P.M. cannot be liable, even if Mr. Edgar was its employee, because Illinois case law holds that employers cannot be liable for the negligence of their employees while they're commuting to work. In Pine v. Whitmer, the Supreme Court held that employees traveling to or from their workplace are not acting in the scope of their employment. And in Barron v. Harris, Illinois Corporation, the Third District held that an employer wasn't responsible for a car accident that allegedly occurred because its employee was working long hours for it. For the reasons discussed in those cases, a company like G.P.M. that hires an independent contractor should not be liable for the actions of the independent contractor's employees while they are traveling to its facility to perform their work. So as the appellant is arguing, Edgar and Majerzyk is conflicting testimony as it relates to whether G.P.M. required a 7 a.m. start time or a daily check-in time. Why doesn't that establish a genuine issue of material fact under question and control? For several reasons. First of all, Majerzyk's testimony isn't just self-serving. It's also speculative, because he is trying to get testimony about Edgar's state of mind at the time of the accident. And he has not offered a sufficient factual basis for offering testimony about what Edgar was thinking when he drove through the stop sign. All he testified to was that he personally believed Mr. Edgar was rushing, but he didn't testify that Mr. Edgar was driving faster than the speed limit, that Mr. Edgar had driven through other stop signs on the way to that intersection, or that Mr. Edgar had admitted to him that he was rushing because he wanted to get to G.P.M.'s facility at a certain time. And the argument that appellant's counsel made about the fact that it wasn't physically possible to get to G.P.M.'s facility by the 7 a.m. start time actually helps G.P.M. in this case. If it wasn't physically possible for Mr. Edgar to get to the facility by 7 a.m., no matter how fast he was driving, then it isn't reasonable to infer that when he was driving the speed limit, he was rushing to get to the facility and that's why he ran through the stop sign. In order to draw a reasonable inference from a fact, the inference that's drawn needs to be the probable inference, what was most probable to infer. In this situation, Mr. Edgar could have driven through the stop sign for any number of reasons. It could be possible. That he was rushing is only one possible inference. That he simply wasn't paying attention, that he was tired because he got up at 3.45 in the morning, or some other reason, are also equally possible. And therefore, it isn't reasonable to infer that the only reason he drove through the stop sign is because he was speeding. For those reasons, Mr. Majerzyk's testimony isn't admissible and can't be used to create a question of fact that somebody judges. That leaves Mr. Edgar's testimony that he wasn't rushing in conjunction with the undisputed fact that he wasn't speeding and that he personally believed he had the time to get to G.P.M.'s facility by 7 a.m. My colleague's counsel has done some math with Google Maps and he disagrees, but Mr. Edgar testified he believed he would get to G.P.M.'s facility at 7 a.m. That right there means... I can take a break if you want. Excuse me. That's okay. It's okay. Ready to proceed? So to briefly summarize, Mr. Edgar's testimony is undisputed because Mr. Majerzyk's testimony is inadmissible. And public policy strongly supports G.K.N.'s arguments here under both vicarious and direct liability. As this court explained in Berence, the burden plaintiffs seek to impose on G.K.N. would be enormous and result in poor social policy that is likely to have an onerous impact not only on employers but also on the workforce. That is because once an employee's workday has ended, the employer's ability to control physical conditions surrounding the employee is non-existent. That certainly applies here, where the accident occurred before Mr. Edgar and Mr. Majerzyk were supposed to start work, and 63 miles away from the facility where they were supposed to perform that work. So the evidence showed that G.K.N. would do its own monthly maintenance and look at these cranes, under-reserved cranes, right? Correct. And then OSHA required to get this annual. Obviously, with certification, maybe that's longer. But these processes were very much related to each other. And even when overhead and iron horse are there, we have this situation where they're not just left alone to their own devices. There is some interaction in terms of, I want you to start here, I want you to go there. You mentioned to the lubrication, there was some unhappiness about the lubrication that was used, so they used a different lubrication. Doesn't this start to speak to a suggestion, at least, that maybe there is some control being exercised as it relates to what might otherwise be independent contractors? Well, first of all, to the extent that that is any evidence of control, it is only evidence that some control was exercised while they were at G.K.N.'s facility. And they were supposed to start working there after 7 a.m., according to a college theory of the case. That is not evidence that G.K.N. exercised any control over these gentlemen while they were commuting to the facility. Then, if you look at what Your Honor suggests... Can you bifurcate vicarious liability with independent control? You can bifurcate vicarious liability when you start looking at scope of agency. And that is why the going and coming rule holds that employers are not liable for the negligence of their employees while they are commuting to the facility. And so, even if Edgar and Majerzyk were arguably or allegedly agents of G.K.N. while they were working at G.K.N.'s facility, the fact that this accident occurred while they were commuting means that G.K.N. cannot be vicariously liable for that. But then, to address what Your Honor raised about G.K.N.'s maintenance of the cranes versus this annual crane inspection, there is no evidence in the record, either through testimony or documents, that the type of maintenance performed on a monthly basis, whatever that was, was in some way the same or similar to what is required for this OSHA annual inspection. There's no testimony on that one way or the other. So, it isn't reasonable to infer that G.K.N. would have been able to perform these annual inspections, but for OSHA's requirement that they be performed by a third party. In addition to that, when it comes to where Mr. Edgar and Mr. Majerzyk worked in the facility, the evidence shows that G.K.N.'s employees would suggest to them that they could start working in a certain area, simply because no one else from G.K.N. was working in that area at the time. But there is no evidence that G.K.N. or Mr. Edgar or Mr. Majerzyk, that they had to start working in a specific area and proceed in a certain order. The undisputed testimony in this case is that Mr. Edgar and Mr. Majerzyk could choose to perform their work in any area at any time that they wanted, and G.K.N. actually agreed in its contract that it would let them do their work in any way they saw fit. All that leaves is the testimony about the lubricant, which on its own is not sufficient to find a question of fact as to whether G.K.N. had control over these gentlemen while they were commuting to the facility. I want to turn to the discussion of the factors that are considered when assessing agency. I talked about the going and coming rule. I believe that bright-line rule applied to the undisputed facts of this case precludes imposition of vicarious liability on G.K.N., but I would like to talk through the factors as well. So plaintiffs rely heavily on Spurl v. C.H. Robertson. There are several critical differences between the defendants in Spurl and G.K.N. The first is that the defendant in Spurl was a transportation broker in the business of arranging for individuals, like the driver who caused the accident in that case, to transport loads over the road. G.K.N. isn't in the transportation business. Workers simply need to commute to its facility to do their jobs. This is a fact that the trial court in this case was right to place a great deal of emphasis on. The fact that G.K.N. is in the business of manufacturing vehicle parts and ancillary to that it has to meet certain OSHA requirements does not mean that anyone who performs work related to these OSHA requirements are automatically its agents and G.K.N. is vicariously liable for their conduct no matter where they are when that conduct occurs. The second critical difference between this case and Spurl is that the defendant in Spurl actually dictated how the driver drove her vehicle, including imposing a schedule on her that forced her to violate federal regulations in order to perform the work that it asked her to perform. And as Your Honor pointed out earlier in this argument, G.K.N., neither G.K.N. nor anyone else told Mr. Egger when he actually needed to get up in the morning and drive to pick up Mr. MacJersey. If getting up at 345 was too late, then he should have gotten up at 245. And if that was not possible for him, then he needed to have a conversation with Iron Horse and possibly G.K.N. because this time is of the essence clause that plaintiffs rely on includes an exclusion for events that are outside the control of Iron Horse's employees. So if there was some issue that came up, all they had to do was contact G.K.N. and say, we're not going to be there by 7 a.m. Well, the exclusion is pretty drastic. Earthquake, tornado, nuclear bomb. It's not just any, it's not the car crash. But the evidence in this case shows, for example, when this accident happened, Iron Horse contacted G.K.N. and said the technicians won't be there that day. G.K.N. said that's fine. There was no penalty. Iron Horse was allowed to wait their overhead, as far as G.K.N. knew, was allowed to wait an entire month, and they didn't finish the inspection until December 6th of that year. Mr. Tank? Yes. Was the time as the essence issue resolved by when the project needed to be completed by or when it needed to be initiated? I'm sorry, can you say that again? Sure. The time is of the essence clause in the contract, indicating when the project had to be completed by, correct? But did it give specific hours and number of days, et cetera, for the evaluations to be completed? Actually, it didn't even say when the project needed to be completed by. It was simply a boilerplate provision that said time is of the essence. And as your honors know, the purpose of that type of provision is simply to say that any deadlines that appear in the contract are material. But there were no deadlines in the contract. So to the extent the time is of the essence clause is in any way relevant, or it's argued that it's relevant, I would say it's not, because there are no other deadlines in the contract for the time is of the essence clause to apply to. So going back to Sperl, if you accept plainness theory of the case, all GKN did was tell Mr. Edgar and Mr. Majerzyk that they needed to be at this facility by 7 a.m. That factor by itself is not enough to find a question of factors to control under Sperl or any other case, because of all of the other factors and facts that were in Sperl that the court considered when denying the appellant's motion. And then this goes into the testimony of Edgar and Majerzyk again, that Mr. Edgar was not speeding at the time of the accident, that he didn't feel rushed at the time of the accident. Mr. Edgar actually even testified that when he was at GKN's facility, he didn't feel rushed. And to the extent that there was any pressure on him to complete his work a certain way, he said that came from Mr. Majerzyk, his co-worker, or Iron Horse, his employer, not from GKN. And that is why the facts of this case are much more closely aligned with those in Dow v. Birmingham Steel. The defendant in Dow was in the business of manufacturing steel. It wasn't in the transportation business. The appellate court found that simply because the defendant needed a vehicle to transport steel to its customers and enacted some rules for the driver's conduct at its facility, did not mean the defendant had the authority to control the manner in which the driver performed his work when he was hauling steel over the road at the time of the accident. The same analysis applies here. At most, GKN asked Mr. Edgar to start his workday at 7 a.m. and enacted some rules for his work at the facility. GKN didn't have any rules that told Edgar how to commute to its facility. Mr. Edgar didn't even have any reason to believe he would be in trouble if he arrived later than 7 a.m. And for that reason, GKN asked this court to affirm summary judgment. Thank you. And if you have any questions, thank you. Thank you, Mr. Tank. Mr. Black, are you back on? Thank you. The time is of the essence clause is of significant importance here. Because if GKN's cranes weren't operating, or the cranes that weren't operating in a given area, they couldn't do business, they couldn't manufacture, they couldn't move things around, they couldn't make money. So that was why time is of the essence was important to that. That clause is so important. There's no date certain in the purchase order that this had to be completed. Not in the purchase order. That is correct. There are facts about some of the other attendant situations and what was going on. But GKN still had motive to get Iron Horse overhead working on this so that the OSHA inspection could be completed and so that they didn't have any problems with maintaining their business. Your Honor picked up on the fact that GKN did most of the inspections themselves. These, by OSHA, had to be done annually by an independent third party. And the report issued that way. We can all kind of discern the reason for that, that they just wanted an independent testing service to do that. It's not like this. This testing is that much different from what GKN was doing on a monthly basis. The right to control. I wanted to make sure that I had expressed the factors. I didn't miss anything that I did correctly. We had to talk to the start time. I had termination if late. We had Mr. Hager testifying that these individuals were on the clock while they were pulling. GKN ended up paying for, as part of this, for the mileage portal and for tolls. GKN controlled where they began every day. GKN controlled where they moved throughout the day, which machines would be inspected at certain times and which wouldn't. And again, for some reason, the type of room utilized. Again, this was a multi-day inspection. This wasn't a one-off like, you know, come fix the furnace or anything like that. And it also wasn't a day-by-day all the time trial. Let me correct it. Whatever the application was being used on the iPads by Iron Horse, GKN did not have access to the iPad. The iPad was setting forth, based upon the model number and the equipment, what each inspection would entail. It wasn't that iPad, which was an Iron Horse device, dictating what the Iron Horse employees were doing, vis-a-vis any particular piece of equipment. It was in terms of the actual inspection of the equipment. But we're also talking about the fact that GKN said, OK, don't start here. Don't start here. Move over to here because we've got some work to do. That's in the record. And in terms of that program that's on the iPads, my understanding is that it's kind of a it's not some sort of a plug in. I might be wrong, but that's what it seems to me. I also want to note for the record for the court that Mr. Hager, who is the owner, testified that they were both driving in photos of their contract with GKN. I heard a lot during the argument here, a well stated argument that kind of raised for me just even more facts that need to be figured out of this one that are not capable of being resolved by some adjustment of the state. I think that's all I have. You're going to ask that some judgment be reversed as to all counts. We thank both of you for your audience this afternoon. We'll take the matter under advisement and we'll issue a written decision as quickly as possible.